IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GNC FRANCHISING LLC and GENERAL
NUTRITION CORPORATION,                    CIVIL ACTION No. 06-191

            Plaintiffs,                    Arthur J. Schwab
                                     United States District Judge
   v.

NESTOR SALA,

            Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING MOTION FOR PRELIMINARY INJUNCTION**

**I.  FINDINGS OF FACT**

**A.  Background**

1.      GNC is a Pennsylvania limited liability company with its principal place of business at 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222.

2.      General Nutrition Corporation is a Pennsylvania corporation with a principal place of business at 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222.

3.      Defendant Nestor Sala ("Defendant Franchisee") is an adult individual currently residing at 2934 Capital Park Drive, Tallahassee, Florida 32301.

**B.  Court's Prior Findings of Fact**

4.      The Court incorporates by reference its prior Findings of Fact (doc. no. 22) relating to the denial of Defendant Franchisee's motion to dismiss on issues of jurisdiction, venue, and forum non conveniens.

## C.  Findings of Fact - GNC Franchise Agreement

### I.  In General

5.      GNC has developed and owns a unique and comprehensive system relating to the opening and operation of retail nutrition, health and/or fitness stores ("General Nutrition Centers"), as a result of a substantial expenditure of time, skill, effort and financial resources. The General Nutrition Centers sell vitamin and mineral supplements, sports nutrition products, herbs, health foods, cosmetics and miscellaneous health care products, diet products, sports accessories, fitness products and specialty workout apparel and other products.  The Centers employ individuals who focus on serving customers for these products and services ("the System").

6.      GNC identifies the System by means of certain trademarks, trade names, service marks, logos, emblems and other indicia of origin, including, but not limited to the GNC®, GENERAL NUTRITION CENTER®, and GNC LIVE WELL® marks, and such other names, service marks, and trademarks as are designated by GNC for use in the System ("the Proprietary Marks").

### 2.  Franchise Agreement

7.      Pursuant to the terms of a comprehensive franchise agreement, GNC grants franchises to carefully screened and qualified individuals and/or business entities to operate GNC General Nutrition Center® stores on a nationwide basis.

8.      On or about December 4, 1997, Defendant Franchisee executed a GNC franchise agreement to operate a store located in the San Pablo Family Center in Jacksonville, Florida (the "Franchise Agreement").  By addendum dated March 27, 1998, the location of Defendant Franchisee's store was changed to the Bradfordville Shopping Center in Tallahassee, Florida (the

"Tallahassee Store").  On September 8, 1998, Defendant Franchisee executed a sublease with General Nutrition Corporation with respect to the Tallahassee Store.

### 3.  Termination Provisions

9.      The Franchise Agreement provides that GNC has the right to terminate the agreement immediately and without an opportunity to cure if Defendant Franchisee "fails to comply with the covenants in [Section XVII.B.] of the Franchise Agreement."  (Franchise Agreement at § XV.B.6).  See Findings of Fact 14 and 15 and Conclusions of Law 4.

10.     The Franchise Agreement provides that upon termination of the Franchise Agreement, Defendant Franchisee is obligated to immediately cease operating the business franchised to him by GNC; immediately cease to use any of the Proprietary Marks licensed under the Franchise Agreement; immediately turn over to GNC all manuals and related documents owned by GNC and used in the operation of the GNC store; and grant GNC the right to purchase all inventory and merchandise from the store.

11.     The Sublease for the Tallahassee Store provides that "any default by Sublessee under any Franchise Agreement to which Sublessee may be a party with any wholly owned subsidiary of Sublessor's parent corporation (namely General Nutrition, Incorporated), shall constitute a default under this Sublease and, if any such Franchise Agreement is terminated, the Sublease shall be deemed to be automatically terminated upon the same date as the Franchise Agreement is terminated."

12.     The Sublease for the Tallahassee Store further provides that if Defendant Franchisee's "franchise agreement is terminated, then [GNC], besides other rights or remedies it may have, shall have the immediate right of re-entry and may remove all persons and property from the Premises . . . ."

-3-

**4.  Trademark Provisions**

13.     The Franchise Agreement provides, with respect to the Proprietary Marks, *inter alia*, that:

> Franchisee expressly understands and acknowledges that:
>
> As between the parties hereto, [GNC] has the exclusive right and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.
>
> Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, and all goodwill arising from Franchisee's use of the Proprietary Marks in its franchised operation under the System shall inure solely and exclusively to [GNC's] benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.
>
> (Franchise Agreement at § VIII.C.1 and 2).

14.     The Franchise Agreement provides that Defendant shall refrain from engaging in any act injurious or prejudicial to the goodwill associated with the Propriety Marks and the GNC System.  (Franchise Agreement at § XVII.B.1).

15.     The Franchise Agreement provides that "Franchisee acknowledges that Franchisee's violation of the terms of  . . .  Section XVII [re: the Proprietary Marks] would result in irreparable injury to [GNC] for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance, of, and agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining an injunction prohibiting any conduct by Franchisee in violation of the terms of this Section XVII." (Franchise Agreement at § XVII.G)

## D.  Findings of Fact - Sale of Ephedrine-Containing
## Product at Defendant Franchisee's Store

16.    On February 2, 2006, a "mystery shopper" hired by GNC visited the Tallahassee Store and purchased an ephedrine-containing product at Defendant Franchisee's store.  GNC was informed of this transaction (i.e., that a banned ephedrine-containing product was sold from Defendant Franchisee's store).

17.    Seven (7) days later, on February 9, 2006, Brad Sudekum ("Sudekum"), a GNC Regional Sales Director, visited the Tallahassee Store to ascertain whether banned ephedrine-containing products were being sold by Defendant Franchisee.

18.    Upon his arrival at the Tallahassee Store, Sudekum proceeded to the Sports Supplements section of the store.  He was approached by one of the sales associates working at the store.  The sales associate asked Sudekum if she could assist him or point Sudekum in the right direction.  Sudekum told the sales associate that Sudekum was looking for a fat-burner product for his girlfriend who was trying to lose some weight.  Sudekum told the sales associate that his girlfriend had tried Xenadrene and Hydroxycut, but complained that the products did not give her the same results they had a few years ago.

19.    The sales associate told Sudekum that this lack of performance was the result of those products no longer containing ephedra.  The sales associate told Sudekum that the store had ephedra-containing products for sale.  The sales associate then sold Sudekum a bottle of Vasopro containing 48 pills which each contain 25 mg of Ephedrine HCL.  Sudekum was charged $19.99 for the Vasopro; he paid cash to complete the transaction; and he exited the store.

20.    Later in the day, Sudekum returned to the Tallahassee Store day with Liz Bouck, another GNC employee.  Sudekum introduced himself to the sales associate and informed her

that he needed to confiscate all ephedra-containing products in the store.  The sales associate gave Sudekum three bottles of Vasopro which were identical to the bottle of Vasopro which he had purchased earlier in the day at Defendant Franchisee's store.

### E.  Findings of Fact - Notice to Defendant Franchisee that Sale of Ephedrine-Containing Products were Prohibited

21.     GNC's franchisees, including Defendant Franchisee, had been notified on numerous occasions that ephedrine was an ingredient that was unapproved for sale in all GNC stores and that the sale of ephedrine-containing products was grounds for immediate termination of the franchise.  At least five (5) notices regarding the ban on the sale of ephedrine-containing products were sent to Defendant Franchisee, including notices sent on May 2, 2003, June 5, 2003, April 20, 2005, June 1, 2005 and June 22, 2005.

22.     On June 22, 2005, Defendant Franchisee was explicitly "advised that [GNC's] policy is to immediately terminate any franchisee that has any Ephedra product in their store." This notification also reiterated that provision of the Franchise Agreement which precludes Defendant Franchisee from engaging in acts that injure or prejudice the goodwill associated with the GNC Proprietary Marks.  See Findings of Fact 14.

### F.  Findings of Fact - Termination of Franchisee

23.     On February 10, 2006, promptly after Sudekum's visit of Defendant Franchisee's store, GNC terminated the Franchise Agreement for the Tallahassee store, because Defendant Franchisee was offering products for sale to the public that contained ingredients that had been banned by the United States Food and Drug Administration ("FDA") and proscribed by GNC, and because GNC believed that said sales were injurious and/or prejudicial to the goodwill associated with the Proprietary Marks and the GNC System.

24.     Defendant Franchisee has refused to turn over his franchised location to GNC, refused to comply with the post-termination obligations set forth in the Franchise Agreement, and continues to operate his franchised store.  He has indicated that he will continue to reject efforts by GNC to assume operation of the store.

## II.  CONCLUSIONS OF LAW

### A.  Court's Prior Conclusions of Law

1.     The Court incorporates by reference its prior Conclusions of Law (doc. no. 22), including that Pennsylvania law is the applicable law in this case.

### B.  Legal Standard - Preliminary Injunction

2.     The standards for a preliminary injunction are well established, and require the Court to consider the following four factors:

> (a)    whether the movant has shown a reasonable probability of success on the merits;
>
> (b)    whether the movant will be irreparably harmed by denial of the relief;
>
> (c)    whether granting preliminary relief will result in even greater harm to the nonmoving party; and
>
> (d)    whether granting the preliminary relief will be in the public interest.

*ACLU v. Reno*, 217 F.3d 162, 172 (3d Cir. 2000).

### C.  Reasonable Probability of Success

#### 1.  Breach of Contract Issues

3.     The Court finds that GNC has a reasonable probability of success on the merits of its breach of contract claim.

4.      The Franchise Agreement provides that Defendant Franchisee shall not "do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Franchisor's Proprietary Marks and the System." (Franchise Agreement at § XVII.B.1).  The Franchise Agreement further provides that GNC has the right to immediately terminate the Franchise Agreement if Defendant Franchisee engages in acts injurious or prejudicial to the goodwill associated with the Franchisor's Proprietary Marks and the System.  GNC terminated the Franchise Agreement of Defendant on February 10, 2006 based on the sales of products containing ephedrine. GNC had notified Defendant Franchisee that sale of products containing ephedrine was grounds for immediate termination.

5.      By federal regulation, dietary supplements containing ephedrine alkaloids are considered "adulterated" for purposes of the Federal Food, Drug and Cosmetic Act. 21 C.F.R. § 119.1.  Ephedrine may only be sold as the active ingredient in an over-the-counter drug properly sold as a bronchodilator.  21 C.F.R. § 341.16.  The introduction into interstate commerce of any adulterated food is prohibited by the Federal Food, Drug and Cosmetic Act.  Such action can be remedied by seizure, injunction or monetary penalties.  *See* 21 U.S.C. §§ 331-334.

6.      Pursuant to the Dietary Supplement Health and Education Act, "dietary supplement" is defined as a "product (other than tobacco) *intended* to supplement the diet that bears or contains one or more of the following dietary ingredients: (A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a

concentrate, metabolite, constitute, extract, or combination of any of ingredient described in clause (A), (B), (C), (D), or (E)." 21 U.S.C. § 321(ff)(1) (emphasis added).

7.      Ephedrine is an ephedrine alkaloid and an extract from an herb or botanical.  Federal Register Volume 69, Number 28 at p. 6789 ("The ephedrine alkaloids, including, among others, ephedrine . . . are chemical stimulants that occur naturally in some botanicals, but can be synthetically derived.  The ingredient sources of the ephedrine alkaloids in dietary supplements include raw botanicals (i.e., plants) and extracts from botanicals.").

8.      A substance's intended use is relevant to deciding whether the product is a dietary supplement.  *See* 21 U.S.C. § 321(ff)(1) (noting a "dietary supplement" is a "product (other than tobacco) *intended* to supplement the diet"); *see also* 21 U.S.C. § 321(g)(1) (defining "drug" as "articles *intended for use* in the diagnosis, cure, mitigation, treatment, or prevention of disease in man") (emphasis added).

9.      The Court finds that the ephedrine-containing products sold at Defendant Franchisee's store are properly classified as dietary supplements, Defendant's reliance on Nutraceutical Corp. v. Crawford, 364 F.Supp.2d 1310 (D. Utah 2005) notwithstanding. That decision invalidated the regulation banning ephedirne as a dietary supplement, but as Defendant Franchisee acknowledges, litigation over that issue continues throughout the country.  See, e.g., NVE, Inc. v. Dep't. of HHS, 436 F.3d 182 (3d Cir. 2006); In re Ephedra Prod. Liability Litig., 393 F.Supp.2d 181 (S.D.N.Y. 2005).  As set forth in the foregoing Findings of Fact, the products were sold at a store which is in the business of selling dietary supplements, and the products were sold by the sales associate in response

to questions regarding weight-loss products.  This evidence demonstrates that the intended use of the product was use as a dietary supplement.

10.     Whether or not ephedrine should be banned as a dietary supplement, and whether the regulation invalidating such use is ultimately found to have been invalid by a court of last resort, at the time ephedrine containing products were sold from Defendant Franchise's store, such products were banned, and GNC had placed its franchisees, including Defendant Franchisee, on notice not to sell such products on pain of immediate termination.

11.     The Court further finds that the sale of ephedrine-containing products by Defendant Franchisee constitutes an act injurious or prejudicial to the goodwill associated with GNC Proprietary Marks because publicity of such sales could harm the reputation of GNC and diminish its standing with consumers.

12.     Defendant Franchisee does not contest the fact that ephedrine-containing products were sold at his store.  Rather, Defendant Franchisee claims that the products were being sold by an employee outside the course and scope of her employment and therefore Defendant Franchisee should not be held responsible for these actions.

13.     However, that employee's conduct was within the course and scope of employment with Defendant Franchisee.  The employee was a sales representative whose job was to sell dietary supplements and similar products to customers of the GNC store.  On the two known occasions where ephedrine-containing products were sold, the employee sold the products to retail customers.  With respect to the sale to the GNC representative, the sales associate sold the ephedrine-containing product to the GNC representative in response to specific inquires about weight-loss products.  Thus, the sale

of ephedrine-containing dietary supplements was conduct tied to Defendant Franchisee's business and was within the scope and course of the sales associate's employment.

14.     Defendant Franchisee is contractually obligated to ensure that the store is operated consistent with the requirements of the Franchise Agreement.  Defendant Franchisee selected the employees to conduct business at the store, and Defendant Franchisee must bear responsibility for the conduct of those employees.

15.     Accordingly, the Court finds that GNC has a reasonable probability of success on the merits on its breach of contract claims.  GNC's termination of the Franchise Agreement on February 10, 2006 was lawful and enforceable.

### 2. Trademark Infringement and Unfair Competition Issues

16.     The Court finds that GNC has a reasonable probability of success on the merits on its trademark infringement and unfair competition claims.

17.     Federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).  To prove either, a plaintiff must demonstrate that: (a) it has a valid and legally protectable mark, (b) it owns the mark, and (c) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. Id.

18.     Ownership of a valid and legally protectable mark is proven where the mark is federally registered and has become "incontestable" under the Lanham Act. *See Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994); 15 U.S.C. §§ 1058, 1065.  A trademark is incontestable after the owner declares in an affidavit to the Commissioner of Patents that the mark has been registered, has been in

continuous use for five consecutive years and that there has been no adverse decision concerning the registrant's ownership or right to registration. Id. at 472 n. 7; 15 U.S.C. § 1065(3).

19.     GNC owns the GNC™, GNC®, GENERAL NUTRITION CENTER®, and GNC LIVE WELL® marks, and these marks are valid and legally protectable marks. See *GNC Franchising LLC v. Masson*, 2005 WL 3434076 (W.D. Pa. 2005) (Lancaster, J.) ("It is clear that GNC owns the marks at issue here because the marks are federally registered.  It is also clear that the marks are valid and legally protected.").

20.     "To prove likelihood of confusion, plaintiffs must show that 'consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).

21.     The likelihood of confusion created by Defendant Franchisee's continued operation of the store is obvious (i.e., Defendant Franchisee is holding himself out to be a GNC franchisee despite the fact that his franchise agreement has been properly terminated).

22.     The public would have no way to know that Defendant Franchisee is no longer a GNC franchisee and that he is not entitled or authorized to use the GNC Proprietary Marks he currently is using in the operation of the store.

23.     In a similar case involving the termination of another GNC franchise, this Court noted the likelihood of confusion caused by a terminated franchisee's continued use of GNC's marks.  *See GNC Franchising*, 2005 WL 3434076 at *2 (Lancaster, J.)

(noting "consumers would likely be confused concerning the source of GNC-marked products and stores operated by [the terminated franchisee.]").

24.     Accordingly, the Court finds that GNC has a reasonable probability of success on the merits on its trademark infringement and unfair competition claims.

### D.  Irreparable Harm

25.     The Court finds that GNC will be irreparably harmed by denial of the motion for preliminary injunction.

26.     In the context of trademark disputes, "trademark infringement amounts to irreparable injury as a matter of law." *Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 237 (3d Cir. 2003); *Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990).  In the *Opticians* case, the United States Court of Appeals for the Third Circuit concluded that infringement constitutes a *per se* injury "even if the infringer's products are of high quality." *Id*.  The Court reasoned that infringement inhibits the owner's ability to control its own marks, which in turn creates the potential for damage to its reputation. *Id*.  "Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Id*.

27.     This Court previously has held that a terminated franchisee's continued use of GNC Proprietary Marks constitutes irreparable injury as a matter of law.  *See GNC Franchising*, 2005 WL 3434076 at *2 (Lancaster,  J.) ("Further, GNC's allegations of trademark infringement by [the terminated franchisee] constitute irreparable harm as a matter of law.").

28.     Moreover, Defendant Franchisee agreed that any violation of the Agreement with regard to the Proprietary Marks would constitute irreparable injury as a matter of law.  (Franchise Agreement at XVII.G.)

29.     Grounds for finding irreparable injury herein include loss of control of reputation, loss of trade, loss of goodwill, and loss of control of Proprietary Marks.  GNC has suffered loss of control of its reputation, loss of trade, and loss of goodwill as result of Defendant Franchisee's holding himself out to be a GNC franchisee even though the franchise agreement has been terminated.  If he is not enjoined and continues to operate the store, GNC's reputation is in the hands of an individual with a proven propensity to offer banned product for sale to the public.

### E.  **Balance of Hardships**

30.     In deciding whether injunctive relief is appropriate, the Court must balance the hardships to the respective parties.  This balancing test is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner. *Opticians Assoc. of Am.*, 920 F.2d at 197.

31.     Since, as stated above, termination of the franchise agreement by GNC was lawful, Defendant Franchisee will not be harmed by an Order compelling him to comply with the terms of the Franchise Agreement and cease operations at the store.  Defendant Franchisee has no right to operate a GNC store, using GNC's Proprietary Marks.  The injunctive relief requested by GNC will merely require Defendant to comply with the post-termination obligations set forth in the Franchise Agreement.

32.     Moreover, Defendant Franchisee's damages (if any) would be economic losses which are ascertainable and could be recovered from GNC if Defendant

-14-

Franchisee established GNC's termination as wrongful. *See GNC Franchising*, 2005 WL 3434076, at *3 (Lancaster, J.) (noting the Court determined that if the terminated franchise "will suffer economic losses from no longer operating the GNC stores, those losses are ascertainable and can be remedied by money damages if he is ultimately successful in proving that GNC wrongfully terminated his franchises.").

33.     Since GNC will be irreparably harmed absent the issuance of the equitable relief, and since Defendant's damages, if any, can be remedied by monetary damages, the balancing of the harm weighs in GNC's favor, subject to a substantial bond.

### F.  **Public Interest**

34.     The final test is whether the issuance of a preliminary injunction furthers the public interest.

35.     Where the plaintiff, as here, has demonstrated a substantial likelihood of success on the merits, the public interest leans even more toward granting the injunction. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*, 290 F.3d 578, 597 (3d Cir. 2000).

36.     As discussed above, GNC has demonstrated the likelihood of success on its trademark infringement claims against Defendant Franchisee (as well as its breach of contract claims).  As the Third Circuit recognized, "[p]ublic interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Assoc. of Am.*, 920 F.2d at 197-98 (finding that because a likelihood of consumer confusion created by the concurrent use of the marks at issue, it followed that if such use continues, the public interest would be damaged); *Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 156 (3d Cir. 1984) (noting that

there is a public interest in the protection of the trademark and to avoid confusion in the public); *SK&F, Co. v. Premo Pharmaceutical Laboratories*, 625 F.2d 1055, 1057 (3d Cir. 1980) ("preventing deception of the public is itself in the public interest").

      37.    This Court previously has held that the public interest would be served by an injunction preventing a terminated GNC franchisee from continuing to use GNC Proprietary Marks. *See GNC Franchising*, 2005 WL 3434076 at *3 (Lancaster, J.) (noting the public interest "factor weights in favor of granting GNC's request for injunctive relief so that consumers will not be confused by the concurrent use of the GNC marks by both viable GNC franchises and [Defendant's] terminated franchises.").

      38.    Therefore, Defendant Franchisee's continued operation of store, using the GNC Proprietary Marks, creates a substantial likelihood of confusion, and thus the public interest will be served by the issuance of a preliminary injunction.

### G. **Conclusion**

39.     For these reasons, GNC is entitled to a preliminary injunction enforcing its contractual and trademark rights.

40.     Pursuant to Rule 65 of the Federal Rules of Civil Procedure, GNC is required to post a bond "in such sum as the court deems proper, for payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Accordingly, a preliminary injunction will become effective upon GNC's filing of a bond in the proper form, in the amount of $250,000, with the Clerk of the Court.

**SO ORDERED** this 20th day of March, 2006.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All counsel of record as listed below

Amy Kerr Parker, Esquire
Gordon W. Schmidt, Esquire
Kevin S. Batik, Esquire
Gerald J. Stubenhofer, Esquire
McGuire Woods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222-3142

Martin B. Sipple, Esquire
227 South Calhoun Street
Tallahassee, FL 32301